UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REINA MARIE MEZA,<br><br>Petitioner,<br><br>v.<br><br>MICHELLE BONWELL, Chief Probation Officer,<br><br>Respondent. | No.  1:19-cv-00919-DAD-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[THIRTY DAY OBJECTION DEADLINE]** |

Petitioner is a state parolee proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The habeas petition presents one claim: that the evidence was insufficient to support the conviction. As discussed below, the Court finds the claim to be without merit and recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On July 13, 2018, a Tulare County jury found Petitioner guilty of falsely reporting a crime in violation of Cal. Penal Code § 148.5(a).  (Doc. 33-1 at 59-60.)  On July 18, 2018, the court sentenced her to three years of probation.  (Doc. 33-1 at 57.)

Petitioner appealed to the Tulare County Superior Court Appellate Division.  (Doc. 33-6.)  On February 28, 2019, the court affirmed the conviction.  (Doc. 33-10.)  Petitioner then petitioned for transfer to the California Court of Appeal, but the transfer was denied.  (Doc. 33-12.)

1

1    On June 27, 2019, Petitioner filed a petition for writ of habeas corpus in the Sacramento

2  Division of this Court. (Doc. 1.)  The petition was transferred to the Fresno Division on July 8,

3  2019.  (Doc. 3.)  On May 19, 2020, Respondent filed an answer to the petition. (Doc. 32.)

4  Petitioner did not file a traverse.

5  **II.    FACTUAL BACKGROUND**

6    Petitioner and her husband, Arturo Chavez, separated in 2015.  (Doc. 33-3 at 138.) In

7  2017, during times relevant here, they were in a custody battle over their daughter. (Doc. 33-3 at

8  138.)  On July 31, 2017, Detective Ray Guerrero of the Tulare Police Department received a

9  report regarding potential mistreatment of a child. (Doc. 33-3 at 74-76.)  Petitioner called Det.

10  Guerrero and advised him that she believed her daughter was still being abused by her ex-

11  husband, Arturo Chavez. (Doc. 33-3 at 76-77.)  She stated that Chavez was not feeding their

12  daughter and that she was malnourished. (Doc. 33-3 at 77.)  She further stated that at a supervised

13  visit, she had witnessed lice and nits in the child's hair. (Doc. 33-3 at 78.) She also stated she

14  wanted to report that Chavez was still sexually raping and assaulting their daughter. (Doc. 33-3 at

15  78.)  Det. Guerrero contacted Family Services concerning Petitioner's allegations. (Doc. 33-3 at

16  79.)

17    Det. Guerrero then made contact with Petitioner and advised her that these allegations had

18  already been investigated on two prior occasions. (Doc. 33-3 at 79-80.) Petitioner stated she was

19  not satisfied with the Detective's investigation or that of Detective Barrios, and she requested a

20  welfare check of the child at the father's address. (Doc. 33-3 at 80.)  Det. Guerrero went to the

21  father's address and made contact with the father and the child. (Doc. 33-3 at 81.)  He stated that

22  the child appeared to be very healthy, happy, and did not look like she was suffering any type of

23  neglect or malnourishment. (Doc. 33-3 at 81, 106.)  He found no evidence of any neglect,

24  mistreatment, or sexual abuse. (Doc. 33-3 at 82, 106.)

25    Det. Guerrero testified that Petitioner had made six calls for service over the course of the

26  previous few months to the father's address.  (Doc. 33-3 at 84.)  On February 25, 2017, Petitioner

27  had called to notify officers that Chavez was sexually abusing and physically injuring the child.

28  (Doc. 33-3 at 86.)  Officers responded to Chavez's address and found the child to be in good

1    health and happy; there was no evidence of any bruising, marks, or scarring. (Doc. 33-3 at 86.)

2            On March 22, 2017, Petitioner had called to request a welfare check, alleging past abuse.

3    (Doc. 33-3 at 88.)  She called again two hours later, alleging abuse.  (Doc. 33-3 at 88.)  Officers

4    responded to the father's address to conduct a welfare check.  (Doc. 33-3 at 88-89.)  On June 19,

5    2017, Petitioner called for another welfare check and officers responded. (Doc. 33-3 at 89.)  On

6    June 21, 2017, Petitioner contacted Officer Bill Robertson to report ongoing abuse, and Det.

7    Guerrero followed up on the investigation. (Doc. 33-3 at 89-90.)  There was no evidence

8    consistent with any type of abuse. (Doc. 33-3 at 91.)

9            Alfredo Munoz, the child's grandfather, testified that he took care of the child. (Doc. 33-3

10   at 116.) He testified that he was responsible for taking the child to school, picking her up, and

11   feeding her. (Doc. 33-3 at 116.)  He further testified that he had never observed his son abuse or

12   mistreat the child in any way. (Doc. 33-3 at 117.)  He recalled having been contacted by the

13   police on many occasions concerning the welfare of the child.  (Doc. 33-3 at 118.)

14           Officer Sunderland testified that he was on duty on February 25, 2017, when he received a

15   report concerning the potential mistreatment of a child. (Doc. 33-3 at 130.)  Petitioner had

16   reported that the father had been mistreating and sexually abusing the child. (Doc. 33-3 at 131-

17   32.)  Officer Sunderland conducted a welfare check on the child at the father's address, and he

18   found the child to be in good health, and that there were no issues whatsoever. (Doc. 33-3 at 132.)

19           Arturo Chavez, the child's father, testified that he and Petitioner were married but had

20   been separated since September of 2015. (Doc. 33-3 at 138.)  On February 6, 2017, he was given

21   custody of the child. (Doc. 33-3 at 139.)  The child lived with the father and his parents. (Doc. 33-

22   3 at 139.)  He and his parents took care of all of the child's needs. (Doc. 33-3 at 140.)  Chavez

23   testified that he made sure his daughter was fed regularly, and he denied ever mistreating or

24   sexually abusing her. (Doc. 33-3 at 140.)  He testified that he had been contacted by police on at

25   least seven occasions concerning the welfare of his daughter. (Doc. 33-3 at 141.)  He stated

26   Petitioner had made multiple false accusations, e.g., that he had abused the child, that he didn't

27   feed or care for the child, and that Petitioner had discovered traces of semen on the daughter's

28   mouth.  (Doc. 33-3 at 141-45.)  He recalled being contacted by police on July 31, 2017.  (Doc.

33-3 at 145.)  The child was found to be happy, comfortable, and very content. (Doc. 33-3 at 145-46.)

Petitioner testified that she had called the police for welfare checks on six or seven occasions. (Doc. 33-3 at 174.)  Petitioner stated she had seen bruises on her child. (Doc. 33-3 at 174.)  She stated she could not ask the child any questions concerning her bruises according to the custody agreement. (Doc. 33-3 at 174-76.)  On April 30, 2017, she had a visitation with her daughter, and her daughter appeared dirty, unkempt, and hungry.  (Doc. 33-3 at 177-78.)  She also noticed white liquid on the daughter's face, mostly around her cheeks and chin.  (Doc. 33-3 at 178.)  Petitioner called the police and told them she believed her daughter had semen on her face. (Doc. 33-3 at 178.)  On subsequent visits, Petitioner found her daughter to be dirty, hungry, and bruised. (Doc. 33-3 at 178-183.)

On cross-examination, Petitioner stated she had made several police reports against the father alleging physical and sexual abuse.  (Doc. 33-3 at 185.)  She admitted that she had never seen him actually abuse their daughter. (Doc. 33-3 at 185.)  She further stated that she believed she should have more custody of her daughter, and that she would do whatever she could to protect her daughter. (Doc. 33-3 at 185-86.)

Officer Guerrero was recalled on rebuttal. (Doc. 33-3 at 188.)  He testified that he warned Petitioner that if she continued to make false allegations, or duplicative reports on allegations that had already been alleged and were being or had been investigated, she could be arrested for making a false police report. (Doc. 33-3 at 192.)  He stated that after examining the child, talking with her, watching her mannerisms, he did not believe that any of the allegations were occurring. (Doc. 33-3 at 193.)  He did not agree that the only reason Petitioner was calling the police was to ask for welfare checks. (Doc. 33-3 at 194.) Guerrero stated he did not simply relay the reports to a switchboard, but he personally performed the welfare check. (Doc. 33-3 at 195.)  He testified that Petitioner again reported that the father was still sexually raping and assaulting the child. (Doc. 33-3 at 196.)

/////

/////

4

1

### III.     DISCUSSION

2

#### A.     Jurisdiction

3

Relief by way of a petition for writ of habeas corpus extends to a person in custody

4

pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

5

treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6

529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that she suffered violations of her rights as

7

guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare

8

County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

9

2254(a); 28 U.S.C.§ 2241(d).

10

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

11

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12

enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

13

filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

14

and is therefore governed by its provisions.

15

#### B.     Legal Standard of Review

16

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

17

the petitioner can show that the state court's adjudication of her claim: (1) resulted in a decision

18

that was contrary to, or involved an unreasonable application of, clearly established Federal law,

19

as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

20

based on an unreasonable determination of the facts in light of the evidence presented in the State

21

court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

22

Williams, 529 U.S. at 412-413.

23

A state court decision is "contrary to" clearly established federal law "if it applies a rule

24

that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

25

of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

26

different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

27

406).

28

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

1    an "unreasonable application" of federal law is an objective test that turns on "whether it is

2    possible that fairminded jurists could disagree" that the state court decision meets the standards

3    set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

4    application of federal law is different from an incorrect application of federal law.'"  Cullen v.

5    Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

6    a federal court "must show that the state court's ruling on the claim being presented in federal

7    court was so lacking in justification that there was an error well understood and comprehended in

8    existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

9         The second prong pertains to state court decisions based on factual findings.  Davis v.

10   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

11   Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

12   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

13   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

14   U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

15   factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

16   among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

17   1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

18        To determine whether habeas relief is available under § 2254(d), the federal court looks to

19   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

20   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

21   2004).  "[A]lthough we independently review the record, we still defer to the state court's

22   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

23        The prejudicial impact of any constitutional error is assessed by asking whether the error

24   had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

25   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

26   (holding that the Brecht standard applies whether or not the state court recognized the error and

27   reviewed it for harmlessness).

28

1    C.    Review of Petition

2        Petitioner contends that there was insufficient evidence to support the conviction for

3    falsely making a police report.  Petitioner raised this claim on direct review, and it was denied in

4    a reasoned decision by the appellate division of the Tulare County Superior Court, as follows:

5        On appeal, the court 'review[s] the entire record in the light most favorable to the
         judgment to determine whether it contains substantial evidence—that is, evidence
6        that is reasonable, credible, and of solid value—from which a reasonable trier of fact
         could find the defendant guilty beyond a reasonable doubt.' (*People v. Avila* (2009)
7        46 Cal.4th 680, 701.)

8        Defendant Reina Marie Meza asserts her report to law enforcement was only a
         request for a welfare check of her daughter and not a report of a crime. However,
9        there was substantial evidence before the jury that defendant, knowing the report to
         be false, told law enforcement her daughter was being physically and sexually
10       abused. As such, the conviction is supported by the weight of the evidence.

11   (Doc. 33-10 at 1.)

12        a.    *Legal Standard*

13       The law on sufficiency of the evidence is clearly established by the United States Supreme

14   Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

15   307, the test on habeas review to determine whether a factual finding is fairly supported by the

16   record is "whether, after viewing the evidence in the light most favorable to the prosecution, any

17   rational trier of fact could have found the essential elements of the crime beyond a reasonable

18   doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus,

19   only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a

20   petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by

21   the elements defined by state law.  Id. at 324, n. 16.

22       If confronted by a record that supports conflicting inferences, a federal habeas court "must

23   presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

24   such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

25   Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

26   conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

27       After the enactment of the AEDPA, a federal habeas court must apply the standards of

28   Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

b.    *Analysis*

A federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at 324 n. 16. Petitioner was convicted of violating California Penal Code § 148.5(a). That section states:

> Every person who reports to any peace officer listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, the Attorney General, or a deputy attorney general, or a district attorney, or a deputy district attorney that a felony or misdemeanor has been committed, knowing the report to be false, is guilty of a misdemeanor.

Cal. Penal Code § 148.5.

Thus, to be found guilty of this crime, the prosecution must prove three distinct elements: (1) that the defendant reported a crime had been committed; (2) defendant knew the report to be false; and (3) that defendant made the report to a peace officer.

Petitioner contends that she did not report a crime; she instead claims she only requested welfare checks on her child.  As stated by Petitioner, a "welfare check" occurs when police officers respond to an address to determine if a particular individual is "okay." (Doc. 1 at 23-24.) Petitioner notes that a welfare check cannot be deemed a report of a commission of a crime, and

1    contends the first element of the offense could not be established.  Petitioner's contention is

2    unavailing.

3          According to the record, Petitioner did not only request that the officer check to see if her

4    daughter was okay.  According to the officer, she also reported that the father was sexually and

5    physically abusing their daughter.  As noted by one of the judges during the appellate hearing, "if

6    a child is being physically or sexually abused, it's certainly a crime."  (Doc. 33-9 at 7.)

7    Therefore, a rational jurist could agree that Petitioner was reporting a crime.

8          Second, Petitioner contends that there is no evidence that she knew the report to be false.

9    At trial, she testified that she believed her reports to be true.  She contends there is no evidence to

10   contradict her good faith belief in her allegations.  Petitioner ignores the testimony of Officer

11   Guerrero and the numerous reports she made that were completely unfounded.  Based on the

12   totality of the evidence, a rational jurist could have disbelieved Petitioner's testimony, and

13   accepted the testimony of law enforcement that Petitioner was making false criminal reports in

14   order to obtain custody of the child.

15         Viewing the evidence in the light most favorable to the prosecution, Petitioner fails to

16   show that no rational trier of fact would have agreed with the state court's determination.

17   Petitioner fails to demonstrate that the state court rejection of her claim was contrary to, or an

18   unreasonable application of, the <u>Jackson</u> standard.

19   **IV.     RECOMMENDATION**

20         Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

21   DENIED with prejudice on the merits.

22         This Findings and Recommendation is submitted to the United States District Court Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

24   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

25   thirty (30) days after being served with a copy of this Findings and Recommendation, any party

26   may file written objections with the Court and serve a copy on all parties.  Such a document

27   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

28   to the Objections shall be served and filed within ten (10) court days (plus three days if served by

mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections

within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez</u>

<u>v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **July 6, 2020**                              /s/ *Sheila K. Oberto*
                                                 UNITED STATES MAGISTRATE JUDGE